RASHEED v CHRYSLER CORPORATION

Docket Nos. 95122, 95774. Argued November 3, 1993 (Calendar No. 10). Decided May 17, 1994.

Muhammad Rasheed brought an action in the Wayne Circuit Court under the Civil Rights Act, MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.*, against Chrysler Corporation and James Senart, his supervisor at Chrysler, alleging wrongful discharge. Before trial, the court, Richard P. Hathaway, J., ruled that any damages would be limited to the thirteen-month period of unemployment preceding the plaintiff's rejection of an offer by Chrysler to reinstate him to his former position with full seniority, but without backpay. Following trial, the court granted a directed verdict for the defendants on all but the plaintiff's claim of religious discrimination, entering judgment on a jury verdict of that claim for the plaintiff. In a subsequent hearing, conducted without a jury, the court ordered Chrysler to reinstate the plaintiff as a newly hired employee with no seniority. The Court of Appeals, FITZGERALD, P.J., and HOOD, J. (J. C. KINGSLEY, J., dissenting in part), affirmed (Docket No. 129620). Both parties appeal.

In an opinion by Justice RILEY, joined by Chief Justice CAVANAGH, and Justices BRICKLEY, BOYLE, GRIFFIN, and MALLETT, the Supreme Court *held:*

Because the trial court made its decision regarding the appropriate remedy before all factual issues were decided, remand is required to resolve the issue of the reasonableness of the plaintiff's rejection and a reassessment of the appropriate remedy. The trial court properly denied the defendants' motion for a directed verdict on the claim of intentional discrimination because factual questions remained.

1. Trial courts have wide discretion to fashion appropriate remedies in wrongful discharge cases. A discharged employee has a duty to mitigate damages. Failure to do so, whether by failing to seek other suitable employment or by rejecting an unconditional reinstatement offer, is an affirmative defense to be established by the employer. Whether an employee acted reasonably in not seeking or accepting particular employment is to be decided by the trier of fact.

2. Reinstatement offers that are clear on their face may be

construed by the courts as a matter of law. Where an offer properly may be characterized as ambiguous, construction is permitted. Where it becomes necessary to consider the parties' intent, the inquiry is a question of fact. While conditionality may be decided as a matter of law under appropriate circumstances, reasonableness is a question of fact that must be decided independently. An unconditional offer of reinstatement may be used as proof of an unreasonable rejection in satisfaction of the employer's burden. However, if there are any differences between the offer and the previous employment, with the exception of backpay, rejection based in part on the difference precludes a peremptory ruling by the court, and reasonableness in light of the particular circumstances must be determined.

3. Once it is established that a reinstatement offer is unconditional, a rebuttable presumption arises that its rejection is unreasonable. To rebut, the employee must offer reasonable grounds for rejection that are based on the employment as contemplated by the offer rather than for purely personal reasons. Failure by the claimant to provide a legitimate basis for a rejection forfeits the right to front pay. In this case, the issue of the reasonableness of the plaintiff's rejection was improperly removed from the jury. The trial court erred as a matter of law in deciding the continued backpay issue before the factfinder decided the defendants' ultimate liability for the alleged discriminatory discharge, requiring reversal of the Court of Appeals decision and remand to the trial court for reconsideration of the issue of reasonableness and the appropriate remedy.

4. A claimant asserting an intentional discrimination claim must establish as part of a prima facie case a discriminatory predisposition of the employer and an act in furtherance of this predisposition. In this case, the decision to terminate the plaintiff was made entirely on the basis of the supervisor's report, and the court properly allowed the plaintiff to offer proof that the reason asserted was a mere pretext. In unique circumstances, ordinarily neutral mechanisms for termination may qualify as discriminatory employment practices. The facts of this case constitute such unique circumstances. Reasonable jurors could have reached different conclusions regarding whether the labor relations manager was aware of the alleged discrimination and acted in furtherance of it.

Reversed and remanded.

Justice LEVIN, writing separately, stated that federal case law does not support the proposition that Michigan courts have

broad discretion to fashion appropriate remedies in wrongful discharge cases. Federal cases construing title VII of 42 USC 2000e-5(g) are not persuasive where a damage remedy has been sought under the Michigan Civil Rights Act. Nor do those cases grant federal courts the power to deny a plaintiff found to be a victim of an unlawful employment practice a remedy that would make the victim whole.

In wrongful discharge cases, separate determinations of the conditionality of a reinstatement offer and of the reasonableness of a rejection need not be made. In deciding whether a prevailing plaintiff may recover damages for a period following the rejection of an offer of reinstatement, the trier of fact need only determine whether the plaintiff failed to mitigate damages, as is required in other wrongful discharge cases in Michigan and in the federal system where the alleged failure to mitigate concerns the plaintiff's rejection of an offer of employment by the original employer that differs from the original job or when the plaintiff reasonably refuses to accept an offer of employment from another company. The issue of the conditionality of a reinstatement offer does not become a matter of law to be decided by the court simply because the employer has offered to reinstate the discharged employee. Assuming that whether an offer of reinstatement was conditional and whether the plaintiff acted reasonably in rejecting such an offer are proper are separate inquiries, each inquiry presents a question of fact for the trier of fact, and neither may be resolved by the court as a matter of law unless reasonable minds could not draw different conclusions concerning conditionality or reasonableness.

MCL 37.2803; MSA 3.548(803) provides that the Civil Rights Act is not to be construed to diminish the right of a person to direct or immediate legal or equitable remedies in the courts, simply repeating the language of Const 1963, art 5, § 29, providing for the establishment of a Civil Rights Commission, with powers provided by law to carry out its purposes, and proscribing any construction that would diminish the right of any party to direct and immediate legal or equitable remedies in the courts. Section 803 says nothing at all about what those legal or equitable remedies might be.

Section 801 does not provide that the courts of this state may provide an equitable remedy such as injunctive relief or a damage remedy, as the court thinks best in the exercise of its discretion. Rather, it provides that a person alleging a violation of the Civil Rights Act may bring a civil action for appropriate injunctive relief, or damages, or both. The discretion whether

to seek an equitable remedy, such as injunctive relief as well as damages, is confided by the constitution and the Legislature, consistent with art 5, § 29, to the person alleging a violation of the Civil Rights Act.

The majority has an extravagant view of judicial power in concluding that it may arrogate to the trial courts of this state the power—so clearly confided by the constitution and the Legislature to the victim of a civil rights violation—whether to seek an equitable remedy as an alternative to a legal remedy. While a fair degree of discretion on the part of the trial court might be necessary to make whole a victim of discrimination who seeks an equitable (injunctive) remedy, that does not mean that, where the victim seeks a legal (damage) remedy in the exercise of the choice confided to the victim by the constitution and the Civil Rights Act, the Supreme Court is empowered to confide to the courts of this state a degree of discretion, in the name of making the victim of discrimination whole, to deny the victim of the choice of a legal (damage) remedy.

United States Courts of Appeals, construing the federal statute, have not found it necessary to create a bifurcated or trifurcated procedure. The majority simply prefers to confide to trial courts, and to remove from jury consideration, questions that it is more comfortable having a judge decide. This is judicial legislation, an arrogation of power to the courts in an area in which the majority does not trust the jury. There is ample power under the traditional approach that permits a trial court to remove from jury consideration any issue of fact that, in the judgment of the trial court, all reasonable persons must reach but one result.

196 Mich App 196; 493 NW2d 104 (1992) reversed.

*Durant & Durant, P.C.* (by *Richard Durant*), for the plaintiff.

*Dickinson, Wright, Moon, Van Dusen & Freeman* (by *John Corbett O'Meara, Robert W. Powell, Noel D. Massie,* and *Eric J. Pelton*) for the defendants.

Amicus Curiae:

*Clark, Klein & Beaumont* (by *Dwight H. Vincent* and *J. Walker Henry*) for Michigan Manufacturers Association.

RILEY, J. Today the Court is called upon to consider a host of issues surrounding a claim for discriminatory termination of employment brought under the Michigan Civil Rights Act.[1] Resolution of these issues requires us to explore the legal and procedural parameters of a discriminatory termination claim involving subsequent offers of reinstatement as they relate to the theory of damage mitigation. We conclude that because the trial court made its decision regarding the appropriate remedy before all factual issues were decided, we remand for resolution of the reasonableness of rejection issue and a reassessment of the appropriate remedy. We also find that because defendants waived the statute of limitations defense, it is unnecessary to deal with plaintiff's continuing violations claim. Finally, we affirm the trial court's denial of defendants' motion for a directed verdict on the intentional discrimination claim.

I

Plaintiff began his employment with Chrysler in 1967 at the Huber facility in Detroit. In 1978, plaintiff converted to the Muslim faith. Three years later, plaintiff was transferred to Chrysler's Trenton engine plant where, according to plaintiff, he was subjected to religious and racial harassment from the first day when guards at the plant allegedly attempted to stop him from taking an Islamic newspaper into the facility because it was "subversive," being called "Ayatollah Cockamania" by his supervisor and alleged major antagonist James Senart, the purposeful placing of pork near his work station during the holy month of

[1] MCL 37.2101 et seq.; MSA 3.548(101) et seq.

Ramadan,[2] numerous remarks about how Muslims should stay in Detroit, attempts to incite anti-Muslim sentiments from the other employees, refusal to replace plaintiff's broken tools while other employees got new tools, several suspensions with racial and religious overtones, and for other similar acts. Plaintiff reported these incidents to union officials and Chrysler managerial employees on numerous occasions. Although the record contains evidence of several meetings between Chrysler management and plaintiff or his union representatives regarding these alleged occurrences, no legal action was taken by plaintiff before his termination.[3]

According to plaintiff, the anti-Muslim atmosphere culminated on July 12, 1984, in a setup orchestrated by Senart and intended to get plaintiff fired from his employment. Senart was allegedly baiting plaintiff,[4] and other employees were improperly removing a storage bin, called a head divider, from plaintiff's work area. When plaintiff retrieved the head divider, Senart allegedly rebuked him for taking it away from another work station. According to defendants, plaintiff kicked the head divider and threw two engine heads onto the ground with such damaging force that they could not be repaired. Senart wrote up a report on

---

[2] The facts indicate that members of the Islamic faith may neither eat nor even expose themselves to pork products during the holy month. Plaintiff asserted that Senart told a co-employee who was eating a pork chop sandwich to give plaintiff some "American food."

[3] Plaintiff was regarded as a good worker, who did more than his share of the engine repair work; however, plaintiff did appear to have problems with his fellow employees. These problems began to escalate when Senart became his supervisor in November of 1983.

[4] Plaintiff testified that Senart was "bird-dogging" him, i.e., standing near plaintiff's station for long periods of time with a disciplinary report sheet in hand waiting for the opportunity to write plaintiff up for violations of company policy or procedure. According to plaintiff, this type of behavior was a frequent manifestation of the discriminatory animus.

the incident, alleging that plaintiff purposefully destroyed company property, which is a ground for immediate discharge. Shortly thereafter, plaintiff was escorted out of the plant by security guards and placed on disciplinary leave.

Charles Fern, the labor relations manager at the Trenton plant, reviewed Senart's report and attempted to interview plaintiff's co-workers.[5] Fern inspected the two engine heads that were indeed damaged, and he looked at two grooves in the floor of plaintiff's work area that were allegedly caused by plaintiff's act of hurling the engine heads to the ground. Fern also spoke to union representatives and other supervisors. As a result of his investigation, Fern concluded that plaintiff had destroyed company property, and the disciplinary leave was upgraded to termination of employment.

Plaintiff filed the instant action in Wayne Circuit Court against Chrysler and Senart for wrongful discharge based on racial and religious discrimination, for intentional infliction of emotional distress, and for fraud or misrepresentation on the part of Senart. *Before trial,* the court ruled that any damages awarded to plaintiff would be limited to the thirteen-month period of his unemployment preceding his rejection of Chrysler's reinstatement offer.[6] *At trial,* the court granted defendants' motion for a directed verdict on all but the religious discrimination claim. The jury returned a verdict in favor of plaintiff on the religious discrimination claim and awarded him $51,300 for lost wages and

---

[5] Interestingly, the record indicates that all of plaintiff's co-workers in the area *refused* to speak to Fern. Ultimately, one of plaintiff's co-workers testified at trial that he saw plaintiff toss the engine heads into a bin in the manner that was common to all similarly situated Trenton employees.

[6] Chrysler offered to reinstate plaintiff with full seniority rights and to reduce the charge of destruction of company property to convert his discharge to a disciplinary layoff.

$10,000 for embarrassment or humiliation. In a subsequent hearing conducted without a jury, the court exercised its equitable powers to order Chrysler to reinstate plaintiff as newly hired, with no seniority, within sixty days of the decision.

Defendants appealed the court's decision not to grant the motion for a directed verdict on the religious discrimination claim, as well as the order requiring plaintiff's reinstatement as a newly hired employee. Plaintiff cross appealed the court's refusal to permit recovery for acts occurring before the three-year period of limitation running from the date of termination and for the decision not to reinstate plaintiff with full seniority rights and backpay.

A majority of the Court of Appeals upheld the trial court's decision not to grant defendants' motion regarding the religious discrimination claim, and it upheld the trial court's "equitable power" to fashion the remedy of reinstatement, albeit without any seniority rights. 196 Mich App 196, 200; 493 NW2d 104 (1992). The majority also upheld the ruling of the limitation of backpay to the thirteen-month period before plaintiff's refusal to accept Chrysler's reinstatement offer. Finally, the majority concluded that plaintiff failed to establish all of the elements necessary to invoke the "continuing violation" theory, which would have permitted plaintiff to recover for alleged acts that occurred more than three years before the filing of the complaint. The dissenting judge, relying heavily on federal precedent, would have reversed the trial court's decision to reinstate plaintiff for what he considered to be an unreasonable refusal to accept Chrysler's "unconditional" offer of reinstatement. *Id.* at 210.

This Court granted both parties' application for leave to appeal.[7]

## II

### A

One year and three months after his termination, Chrysler offered to reinstate plaintiff to his former position with full seniority, but without backpay. The offer provided in its entirety:

> In full settlement of this case, M. Rasheed will be offered reinstatement in accordance with his seniority provided he can meet normal requirements. Upon his return to work his discharge shall be reduced to a disciplinary layoff without back pay for the period during which he was away from the plant.
>
> This action of the Appeal Board shall form no basis or precedent for a decision or settlement in any other case.

On the basis of this offer, defendants moved for partial summary disposition to prevent plaintiff from recovering continued backpay[8] for a failure to accept what they asserted was an "unconditional" offer, as well as to prevent plaintiff's reinstatement. Plaintiff asserted that the offer was conditional because it did not include backpay and

[7] 443 Mich 868 (1993).

[8] Backpay has been broadly defined to include "all monetary awards based on earnings and other fiscal benefits that the plaintiff would have received but for the unlawful employment practice." 2 Larson, Employment Discrimination, § 55.31, p 11-96.1.

In contrast, front pay is defined as "a monetary award that compensates victims of discrimination for lost employment extending beyond the date of the remedial order." *Id.,* § 55.39, p 11-96.121. As case law makes clear after *Ford Motor Co v EEOC,* 458 US 219; 102 S Ct 3057; 73 L Ed 2d 721 (1982), the line of demarcation has been drawn between backpay and the continued right to backpay from the date of a rejection of an unconditional reinstatement offer. Front pay refers to that part of an award that accrues after a decision is rendered.

.

because it offered to convert the termination into a disciplinary layoff rather than remove the blemish from his employment record.[9]

At the hearing on the motion itself, the trial court concluded as follows:

> IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Defendant's Motion is granted as it concerns limiting backpay that Plaintiff can seek, to that period covering July 19, 1984, up to and including August 26, 1985.
> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendant's Motion as it concerns the preclusion of reinstatement for Plaintiff is denied, and Plaintiff will be allowed to present proofs concerning the equitable issue of reinstatement to the trier of fact.
> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that notwithstanding any ruling on reinstatement of the submission of proofs, Plaintiff's backpay is limited to the aforementioned July 19, 1984 to August 26, 1985 period.

It is unclear from this ruling what was the basis for the trial court's conclusion that plaintiff rejected an unconditional offer so that he was not entitled to continued backpay, but that the issue of reinstatement was a question to be decided by the finder of fact. In addressing this issue, we turn first to a discussion of the relevant case law.

B

The law concerning backpay and other remedies in the employment discrimination context has its roots in provisions of the federal Civil Rights Act of 1964, which amended the Civil Rights Act of

---

[9] Bennie Wright, plaintiff's union steward at the time, testified that the reinstatement offer as presented did not permit plaintiff to return "free and clear."

1957.[10] The avowed purpose of the new provisions was to "provide the spur or catalyst which causes employers . . . to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history." *United States v N L Industries, Inc,* 479 F2d 354, 379 (CA 8, 1973), quoted in *Albemarle Paper Co v Moody,* 422 US 405, 417-418; 95 S Ct 2362; 45 L Ed 2d 280 (1975). Modeled after a provision in the National Labor Relations Act, the backpay provision was intended to "make whole" anyone suffering from the effects of employment discrimination. *Albemarle, supra* at 418-419.

Almost a decade later, however, the United States Supreme Court recognized a corollary to the backpay provision on the basis of interim earnings language found in 42 USC 2000e-5(g).[11] In the landmark decision *Ford Motor Co v EEOC,* 458 US

_____

[10] 15 Am Jur 2d, Civil Rights, § 3, p 284.

[11] 42 USC 2000e-5(g) provides:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, . . . hiring of employees, with or without back pay, . . . or any other equitable relief as the court deems appropriate. . . . *Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.* [Emphasis added.]

The remedies listed under article 8 of the Michigan Civil Rights Act, MCL 37.2801 *et seq.*; MSA 3.548(801) *et seq.*, simply permit "appropriate injunctive relief or damages, or both," MCL 37.2801(1); MSA 3.548(801)(1), reasonable costs and attorney fees, MCL 37.2801(3); MSA 3.548(801)(3) and MCL 37.2802; MSA 3.548(802), and any other "direct or immediate legal or equitable remedies in the courts of this state." MCL 37.2803; MSA 3.548(803). There is no specific statutory provision requiring claimants to mitigate their damages by accepting unconditional offers of employment.

219; 102 S Ct 3057; 73 L Ed 2d 721 (1982), the Supreme Court specifically imposed on a discharged employee the duty to mitigate damages under title VII of the federal Civil Rights Act of 1964[12] by accepting unconditional offers of reinstatement even when the offers do not include backpay.[13] The majority held:

> An unemployed or underemployed claimant, like all other Title VII claimants, is subject to the statutory duty to minimize damages set out in § 706(g). This duty, rooted in an ancient principle of law, requires the claimant to use reasonable diligence in finding other suitable employment. Although the unemployed or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position, he *forfeits his right to backpay* if he refuses a job *substantially* equivalent to the one he was denied. Consequently, an employer charged with unlawful discrimination often can toll the accrual of backpay liability by unconditionally offering the claimant the job he sought, and thereby providing him with an opportunity to minimize damages. [*Id.* at 231-232. Emphasis added.]

According to the majority, this duty provides in-

---

[12] 42 USC 2000a *et seq.* Equal employment opportunities are addressed in 42 USC 2000e *et seq.*

[13] It should be noted that the weight of federal authority holds that backpay should be awarded if discrimination is found unless there are special circumstances dictating otherwise. See *Albemarle, supra* at 419-420; *Los Angeles Water & Power Dep't v Manhart,* 435 US 702, 719; 98 S Ct 1370; 55 L Ed 2d 657 (1978); *Rasimas v Dep't of Mental Health,* 714 F2d 614, 626 (CA 6, 1983); *Head v Timken Roller Bearing Co,* 486 F2d 870, 876 (CA 6, 1973); *McCormick v Attala Co Bd of Ed,* 541 F2d 1094 (CA 5, 1976). Special factors that would constitute exceptional circumstances and prevent backpay awards are exceedingly rare. *Albemarle, supra* at 417; *Meadows v Ford Motor Co,* 510 F2d 939, 945 (CA 6, 1975). Theoretically, the issue of mitigation as it relates to a *reinstatement offer,* and not other efforts to secure alternative employment, only concerns circumstances occurring on or after the date of the reinstatement offer. Thus, any entitlement to backpay before the date of the offer is not affected.

centive for employers to voluntarily comply with title VII because it permits the employer to avoid liability for backpay damages and thereby avoid economic waste. *Id.* at 228-229. Moreover, "the victims of job discrimination want jobs, not lawsuits." *Id.* at 230.

Thus, a reinstatement offer, in order to be considered "unconditional" for federal purposes, need not include an offer of retroactive seniority, which may nonetheless be awarded if the claimant is successful in an employment discrimination claim. *Id.* at 232-233.[14] However, a claimant does not violate the duty to mitigate damages by refusing to accept a position that is an unreasonable distance from his home,[15] to accept a position that is not the substantial equivalent of the one sought or from which he was terminated,[16] or to accept an offer with any other unreasonable condition attached to it.[17] Generally, it is the duty of the trier

---

[14] But see *Franks v Bowman Transportation Co,* 424 US 747, 766; 96 S Ct 1251; 47 L Ed 2d 444 (1976) (although discretion to fashion a remedy is broad, "ordinarily [awards of seniority rights] will be necessary to achieve the 'make-whole' purposes of the Act").

[15] See, e.g., *NLRB v Oman Construction Co, Inc,* 144 NLRB 1534 (1963), enforced 338 F2d 125 (CA 6, 1964), cert den 381 US 925 (1965); *Jackson v Wheatley School Dist,* 464 F2d 411 (CA 8, 1972).

[16] See *Rasimas,* n 13 *supra* at 625.

[17] See *Toledo v Nobel-Sysco, Inc,* 892 F2d 1481 (CA 10, 1989) (a requirement that a claimant drop a title VII claim and pass polygraph and physical tests in an offer precluded a finding that the offer was unconditional); *Kilgo v Bowman Transportation, Inc,* 789 F2d 859 (CA 11, 1986) (an invitation to apply for a position was not an unconditional offer of employment). See also *Taylor v Teletype Corp,* 648 F2d 1129, 1139 (CA 8, 1981), cert den 454 US 969 (1981), wherein the United States Court of Appeals for the Eighth Circuit ruled:

> The failure to accept an offer of reinstatement does not automatically terminate an employee's right to relief.
> "In determining whether the right to relief extends beyond the date of an offer of reinstatement, the trial court must consider the circumstances under which the offer was made or rejected, including the terms of the offer and the reasons for refusal." [*Id.* at 1139. Citation omitted.]

of fact to weigh the evidence to determine whether a reasonable person would refuse the offer of reinstatement. *O'Donnell v Georgia Osteopathic Hosp, Inc*, 748 F2d 1543, 1551 (CA 11, 1984), disavowed on other grounds in *Lindsey v American Cast Iron Pipe Co*, 810 F2d 1094 (CA 11, 1987); *Fiedler v Indianhead Truck Line, Inc*, 670 F2d 806, 808 (CA 8, 1982).

Under title VII, the federal courts have wide discretion to fashion a remedy in a discriminatory hiring or discharge case.[18] For example, the award of backpay is treated as an equitable remedy to be decided as a matter of law. *Albemarle, supra* at 417; 2 Larson, Employment Discrimination, § 55.32, pp 11-96.2 to 11-96.4. A court's decision on the issue of backpay is a matter of discretion, and may only be reversed for abuse. *Albemarle, supra* at 415-416; Larson, *supra*, § 55.33, pp 11-96.4 to 11-96.7. At least one circuit court has stated that this discretion permits a denial of backpay accruing before the reinstatement offer as well as front pay. *O'Donnell, supra* at 1550.[19] On the other hand, a

But see *Giandonato v Sybron Corp*, 804 F2d 120 (CA 10, 1986) (a refusal to accept an offer of reinstatement in an age discrimination case for illness of claimant's wife, generalized aversion to working under a district manager, and generalized assertions of the "uncertainty" of the offer was unreasonable); *Morvay v Maghielse Tool & Die Co*, 708 F2d 229 (CA 6, 1983) (an offer of reinstatement conditioned only upon the claimant's submission to a psychiatric examination in light of questionable past behavior terminated continued backpay liability); *Boomsma v Greyhound Food Management, Inc*, 639 F Supp 1448 (WD Mich, 1986) (the rejection of reinstatement offer because it did not include backpay and did not offer compensation for certain medical expenses, and because claimant was happy with his new job, precluded an award of continued backpay).

One point worthy of note is that the Sixth Circuit has previously recognized that an offer of reinstatement may be insufficient to bar awards of continued backpay if it is conditioned upon, among other things, the failure to restore seniority rights. *Morvay, supra* at 232.

[18] On the issue of recoverable damages in the federal system generally, see Larson, n 8 *supra*, §§ 55.00-55.46, pp 11-57 to 11-96.141.

[19] The language in *O'Donnell* upon which defendants rely is dicta.

court's discretion is "hardly . . . unfettered by meaningful standards or shielded from thorough appellate review." *Albemarle, supra* at 416.

On the issue of reasonableness, a claimant required to make reasonable efforts to mitigate damages is not held to the highest standards of diligence. *Rasimas v Dep't of Mental Health,* 714 F2d 614, 624 (CA 6, 1983), cert den 466 US 950 (1984). Moreover, "the claimant's burden is not onerous, and does not require him to be successful in mitigation." *Id.* Finally, the burden of proof on this question shifts to the employer once a prima facie case of employment discrimination has been established. *Id.* at 623-624.

C

The approach of state courts on the issue of backpay/continued backpay is in harmony with that utilized by the federal courts.[20] First, this jurisdiction recognizes a duty of a discharged employee to mitigate damages. See *Shiffer v Gibraltar School Dist Bd of Ed,* 393 Mich 190, 197; 224 NW2d 255 (1974) ("The principle of mitigation is a

First, the Eleventh Circuit's opinion on the backpay/front pay issue is based solely on "logic." 748 F2d 1550. Second, the court reversed the district court's decision to remove from the jury the question whether it was reasonable for the plaintiff to reject the reinstatement offer. *Id.* at 1551.

[20] The Michigan Civil Rights Act, though clearly modeled after title VII, provides an independent basis for state claims of wrongful discharge. Although federal precedent is persuasive, it is not binding on state courts. See *Clark v Uniroyal Corp,* 119 Mich App 820, 824; 327 NW2d 372 (1982); *Northville Public Schools v Civil Rights Comm,* 118 Mich App 573, 576; 325 NW2d 497 (1982). Moreover, the legislative intent behind title VII has been interpreted to permit aggrieved employees to pursue remedies under state and federal laws independent of a title VII claim. See *Alexander v Gardner-Denver Co,* 415 US 36, 48-49; 94 S Ct 1011; 39 L Ed 2d 147 (1974).

Nonetheless, this Court has already relied on federal authority as being persuasive in this area. See *Dep't of Civil Rights ex rel Cornell v Edward W Sparrow Hosp Ass'n,* 423 Mich 548, 560-563; 377 NW2d 755 (1985) (opinion of WILLIAMS, C.J.).

thread permeating the entire jurisprudence . . . it is part of the much broader principle of 'avoidable consequences' "); *Flickema v Henry Kraker Co,* 252 Mich 406; 233 NW 362 (1930) (an offer of reinstatement by an employer to a discharged employee was admissible in evidence on the issue of mitigation of damages). Second, the failure of a discharged employee to mitigate damages, whether by seeking other employment or by rejecting an unconditional reinstatement offer, is an affirmative defense to be established by the employer. *Higgins v Kenneth R Lawrence, DPM, PC,* 107 Mich App 178, 181; 309 NW2d 194 (1981). Third, the question whether an employee was reasonable in not seeking or accepting particular employment is one to be decided by the trier of fact. *Id.; Riethmiller v Blue Cross & Blue Shield of Michigan,* 151 Mich App 188, 194-195; 390 NW2d 227 (1986); *Jenkins v Southeastern Michigan Chapter, American Red Cross,* 141 Mich App 785, 797; 369 NW2d 223 (1985).[21] Fourth, state courts also have a wide

---

[21] Cf. *Sparrow,* n 20 *supra* (the refusal to comply with a discriminatory dress code as a precondition to reinstatement did not run afoul of the duty to mitigate damages). See also SJI2d 105.41, which provides in pertinent part:

Whether the plaintiff was reasonable in not seeking or accepting particular employment is a question for you to decide. However, the plaintiff is obligated to accept an offer of employment which is of "a like nature." In determining whether employment is of "a like nature," you may consider, for example, the type of work, the hours worked, the compensation, the job security, working conditions, and other conditions of employment.

(If you find that the defendant unconditionally offered to [hire/promote/reinstate] the plaintiff to the position [previously held/applied for] or a substantially equivalent position, you shall not award damages for loss of compensation after the date the plaintiff rejected the offer. Substantially equivalent position means one with virtually identical promotion opportunities, compensation, job responsibilities, working conditions, and status. An offer is not unconditional if the job offered involves discriminatory conditions.)

discretion to fashion appropriate remedies in wrongful discharge cases. MCL 37.2801(1); MSA 3.548(801)(1).

We conclude, therefore, that the crux of this case concerns the subtle interplay between a court's broad equitable powers to fashion the appropriate remedy in cases of discriminatory discharge and the factfinder's function of determining whether the rejection of a reinstatement offer was reasonable. As stated earlier, the trial court, without indicating the basis for its decision, held that plaintiff's right to continued backpay was terminated by the "unconditional" offer of reinstatement, but that the issue of reinstatement was a question to be decided by the trier of fact. Critical to our effort to reconcile this ruling are the underlying contractual principles relevant to this area of the law. Thus, it is to a consideration of these principles that we next turn.

III

A

Over the years, various legislatures and the courts have added certain restrictions to the contractual relationship between employer and employee in cases where ordinary contract law did not adequately protect important rights of the parties. Examples are the law on discriminatory discharge, which has been the topic of numerous regulations,[22] guidelines on the right of labor to

The defendant has the burden of proving that the plaintiff failed to mitigate [his/her] damages for loss of compensation.

[22] Examples include title VII of the federal Civil Rights Act, 42 USC 2000e et seq.; the Michigan Fair Employment Practices Act, MCL 423.301 et seq.; MSA 17.458(1) et seq. (since repealed and replaced by the Michigan Civil Rights Act); and the Michigan Handicappers' Civil Rights Act, MCL 37.1101 et seq.; MSA 3.550(101) et seq.

organize,[23] and even rules concerning compensation for work-related injuries.[24] However, although special rules have been adopted in the context of employment law, the contractual basis of the employment relationship remains intact.[25] Therefore, in our attempt to reconcile these two areas of the law in the context of this case, we conclude that the questions that must be addressed are: whether the courts may construe offers of reinstatement using contract principles and, if so, how a ruling on their conditionality affects an employee's right to reject an unreasonable offer. We are persuaded that the application of contract principles will provide a principled basis for discerning the conditionality of reinstatement offers. However, to ensure the statutory rights of employees against

---

[23] 29 USC 151 *et seq.* (the National Labor Relations Act).

[24] MCL 418.101 *et seq.*; MSA 17.237(101) *et seq.* (the Worker's Disability Compensation Act).

[25] For example, the employment relationship has always been called an employment *contract.* The conflict between the presumption of employment at will and termination for just cause relies heavily on contract principles such as express and implied promises, oral promises, and interpretation. Whatever language the courts use in issues surrounding this presumption, it is clear that it is nothing less than a "gap-filler," i.e., a term supplied by the courts in the absence of a specific provision. See, e.g., Restatement Contracts, 2d, § 204, pp 96-97, which provides:

> When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.

See also MCL 440.2201(1); MSA 19.2201(1) ("A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable . . . beyond the quantity of goods shown in such writing"); 17A Am Jur 2d, Contracts, § 195, p 205.

One of the two theories of just-cause employment is "grounded solely on contract principles 'relative to the employment setting.'" See, generally, *Rood v General Dynamics Corp,* 444 Mich 107, 118; 507 NW2d 591 (1993), and authorities cited therein.

Even the duty to mitigate damages derives from contract law. See, e.g., Calamari & Perillo, Contracts (3d ed), § 14-15, pp 610-613.

discriminatory employment practices, we must reconcile the contractual aspects of reinstatement offers with their civil rights counterparts. Thus, we first turn to the contractual principles to be applied to reinstatement offers.

A reinstatement offer that is clear on its face may be construed as a matter of law by the courts.[26] Where the language of the reinstatement offer is properly characterized as "ambiguous,"[27] construction is permitted. *Berk v Gordon Johnson Co,* 232 F Supp 682, 687 (ED Mich, 1964). Where it becomes necessary to consider the parties' intent, the inquiry is a question of fact. *Liberty Mutual Ins Co v Curtis Noll Corp,* 112 Mich App 182, 191; 315 NW2d 890 (1982); *Robinson v A Z Shmina & Sons Co,* 96 Mich App 644, 649; 293 NW2d 661 (1980); 17A Am Jur 2d, Contracts, § 339, p 346.[28] Against this backdrop, we now turn to the interplay between the conditionality of a reinstatement offer and the reasonableness of a rejection.

In a number of federal cases, the courts appear to have decided whether a condition was reasonable so that rejection of the reinstatement offer cut off the right to continued backpay. Careful review of these cases, however, indicates that these decisions were made following review of the trial

[26] See *Dykema v Muskegon Piston Ring Co,* 348 Mich 129, 138; 82 NW2d 467 (1957); *Kilburn v Union Marine & General Ins Co, Ltd,* 326 Mich 115, 118; 40 NW2d 90 (1949); *In re Loose,* 201 Mich App 361, 366; 505 NW2d 922 (1993); 17A Am Jur 2d, Contracts, §§ 337, 339, pp 342-344, 346.

[27] *Raska v Farm Bureau Mutual Ins Co of Michigan,* 412 Mich 355, 362; 314 NW2d 440 (1982) ("A contract is said to be ambiguous when its words may reasonably be understood in different ways"); *Goodwin, Inc v Orson E Coe Pontiac, Inc,* 392 Mich 195, 212; 220 NW2d 664 (1974); *Adkins v Home Life Ins Co,* 143 Mich App 824; 372 NW2d 671 (1985); 17A Am Jur 2d, Contracts, §§ 338, 356, pp 345, 374-375.

[28] The primary goal in the construction or interpretation of any contract is to honor the intent of the parties. See *Stine v Continental Casualty Co,* 419 Mich 89, 112; 349 NW2d 127 (1984); *Brauer v Hobbs,* 151 Mich App 769, 774; 391 NW2d 482 (1986).

courts' rulings on motions for summary judg-
ment,[29] on motions for directed verdict,[30] or on
decisions entered in bench trials, i.e., where the
trial court acted as factfinder.[31] In other words,
these decisions derive from factual determinations
of the courts or from federal motion practice.

On the basis of the foregoing, we conclude that
the issues of conditionality and reasonableness of
rejection are discrete under the federal as well as
the state systems.[32] While the conditionality issue
may be decided by the courts as a matter of law

[29] See *Fiedler, supra* at 809 (decided under FR Civ P 56[e]); *Giando-nato,* n 17 *supra* at 121-122.

[30] See, e.g., *O'Donnell, supra.*

[31] See, e.g., *Rasimas, supra* at 620. See also *Toledo,* n 17 *supra* at 1493; *Boomsma,* n 17 *supra.*

[32] The various circuits' holdings are not without anomalies. See, e.g., *Stanfield v Answering Service, Inc,* 867 F2d 1290 (CA 11, 1989). In *Stanfield,* the Eleventh Circuit reversed an award of reinstatement, but affirmed the denial of interim and front pay. Our review of federal precedent reveals that the district court in *Stanfield* had the discretion to choose between reinstatement and front pay once the jury concluded that the plaintiff was the victim of age discrimination. The appellate court, however, stated "that Stanfield's rejection of the offer was unreasonable is implicit in the trial court's refusal to grant Stanfield interim and frontpay." *Id.* at 1295. Thus, the claimant was left without any backpay, front pay, or reemployment.

This ruling effectively wipes out the plaintiff's right to backpay *even for the period preceding the offer of reinstatement.* If rejection of the offer was unreasonable, this unreasonableness did not arise from the date that the plaintiff was terminated. It is our belief that the Eleventh Circuit mistakenly assumed that the district court relied on some fact-finding power rather than on its equitable power to fashion an appropriate remedy. In turn, the appellate court rested its reversal of the reinstatement on a nonexistent factual finding, which thereby enabled it to ignore the fact that the reasonableness question was one for the jury and not for the courts absent some appropriate form of motion practice. Although we agree that avoidance of the duty to mitigate should cut off benefits, removal of the question from the factfinder disregards the weight of federal authority, improperly shifts the burden of proving mitigation onto claimants, and runs afoul of the primary purposes of title VII, to wit: eradication of discriminatory employment practices and making the victims of such practices whole for injuries suffered.

If for no other reason, we decline to follow *Stanfield* on the basis that the Michigan Civil Rights Act provides a basis of recovery independent of the provisions of title VII. See n 20.

under appropriate circumstances, the reasonableness issue must be decided on an independent basis. Thus, the first step in these cases is to determine the import of a reinstatement offer using contract principles. The second step is to assess whether a rejection is reasonable. An unconditional offer of reinstatement may be used as proof of an unreasonable rejection in satisfaction of the employer's burden. In fact, the federal courts appear to treat unconditional offers as dispositive. However, if there are any differences between the offer and the previous employment position, with the exception of backpay, then a discharged employee's act of rejection, if based in part on that difference or condition, precludes a peremptory court ruling.[33] Rather, the question of reasonableness is one of fact that must take into account the particular circumstances of each case.[34] Once this two-step inquiry has been completed, a court may exercise its broad equitable powers over fashioning the appropriate remedy. See MCL 37.2801(1); MSA 3.548(801)(1); *Ford Motor Co,* 458 US 226; *Albemarle,* 422 US 415-416; Larson, *supra,* § 55.33, pp 11-96.4 to 11-96.7.

On the other hand, we do not wish to trivialize the importance of the mitigation doctrine. It is well established that a discharged employee must

---

[33] An unconditional job offer presumes that the employment is the job previously sought by an applicant or, in the case of a discharge, the old job. Therefore, the offer of a different job would constitute either a condition to the offer's acceptance *or* a factor that may provide the employee with a reasonable excuse to reject the offer. For purposes of simplicity, we hold that a different job may provide an employee with a valid reason to reject an employer's offer, which is to be decided under the reasonableness inquiry.

[34] See *Fiedler, supra* at 808; *Taylor,* n 17 *supra* at 1139; *Rasimas, supra* at 623. See also *Jenkins, Riethmiller,* and *Higgins, supra.*

It matters little whether the issue is framed as a reasonable/unreasonable condition or as a reasonable/unreasonable rejection as long as the courts' power to construe contracts is not extended to remove the rejection question from the finder of fact.

make every reasonable effort to mitigate damages. See *Ford Motor Co, supra* at 231; *Shiffer, supra* at 197-198; *Riethmiller, supra* at 195; *Higgins, supra* at 181. To the extent that the reasons for rejection of a reinstatement offer are unrelated to the offer and the conditions of employment that the offer contains, such reasons would be outside the purview of title VII and the Michigan Civil Rights Act.[35] Moreover, a rejection on grounds unrelated to the employment contained in the reinstatement offer clearly runs afoul of the mitigation doctrine. Because the burden of proving unreasonableness has shifted onto the employer once a discriminatory discharge is established, the onus is on an employer to establish that the true reasons for a rejection are unrelated to any conditions of the employment as are manifest in the reinstatement offer. As the previous discussion has indicated, this requires, first, the interpretation of a reinstatement offer to determine its conditions if they exist and, second, consideration of the reasons for rejection under the circumstances of a particular case.[36]

[35] Under title VII, the duty to mitigate damages has been codified at 42 USC 2000e-5(g). See n 11. Thus, there is statutory federal authority to indicate that unreasonable rejections were never intended to benefit from the protections of title VII. In this jurisdiction, the mitigation doctrine has been adopted in the discriminatory discharge context by cases such as *Riethmiller* and *Higgins, supra.* Although the duty to mitigate has not been codified in the Michigan Civil Rights Act, we nonetheless conclude that rejections of a reinstatement offer for reasons unrelated to the terms of that offer are unreasonable.

For examples of rejections found to be unrelated and therefore unreasonable in the federal courts, see n 17.

[36] As is clear particularly in some of the federal cases cited previously, an employer is not precluded from having unsupported claims of reasonable rejection dismissed under court rules such as MCR 2.116(C)(10), which permits partial or total dismissal of a claim, made as a matter of law, where there is no genuine issue of material fact. See 7 Callaghan's Michigan Pleading & Practice (2d ed), § 43.04.10, p 11. The purpose of the court rule is to avoid "expense, vexation, and delay" and to eliminate "improper issues." *Id.,* § 43.01.50, p 3. Finally, this does not shift the burden of proving the reasonableness issue

At this juncture, there is another inherent conflict that must be considered, to wit: the policy behind creating an incentive for discharged employees to mitigate damages as provided in *Ford Motor Co*[37] and the law of affirmative defenses, which places the burdens of pleading and proof on

onto the employee. Rather, the burden is one of production: specifically, the production of evidence.

> A party opposing a motion for summary disposition based on the lack of a genuine issue of material fact has the burden of coming forth with some evidentiary proof that a genuine issue of fact does exist in order to avoid the granting of the summary judgment. Mere conjecture does not meet the burden of presenting evidence . . . . The party opposing a motion for summary disposition based on an alleged lack of genuine issue as to any material fact must at least assert that such a dispute exists and support the allegation with some independent evidence . . . . [*Id.*, § 43.05.50, p 33.]

[37] The *Ford Motor Co* case involved two job applicants who were offered positions after they had been recalled by their previous employer. Rather than accept Ford Motor's reinstatement offer, the claimants opted to remain with their then-present employer. Later, the claimants were again laid off, resuscitating their claims for front pay. Accordingly, the rejections of the job offers were based on a personal choice to remain with the present employer and *not* for any reason arising from the terms of the defendant's offers. 458 US 236. On the basis of this procedural posture, the United States Supreme Court did not decide the conflict between the incentive to mitigate damages and the burdens of proof concerning affirmative defenses. Rather, the Court sought to prevent the "perverse result of requiring the employer . . . to insure the claimant against the risk that the employer might win at trial" in cases where the claimant has found an equivalent or a better position before the job offer and chooses to keep that employment *and* the possibility of recovery in the discrimination claim rather than accept a defendant employer's attempt to make amends. *Id.* at 238. See also 239-240 and n 26. In short, claimants who have the option of accepting an unconditional offer or of retaining equivalent employment secured after the discriminatory act forfeit any right to front pay when they reject the defendant's offer.

There was a third claimant in the *Ford Motor Co* case whose employment was not the substantial equivalent of the job sought with defendant. However, careful review of the opinion indicates that the third claimant's interests were not addressed in the majority's analysis, being parts II-V of the majority opinion. Presumably, her claim for front pay damages in excess of her earnings at the subsequent employment remained.

the party raising them.[38] An affirmative defense presumes liability by definition.[39] Thus, the burden falls squarely onto the employer to prove mitigating circumstances that would lower a damages award. This burden does not, however, alter a claimant's burden of proving the elements of a discriminatory hiring or discharge decision.

Today we adopt a middle ground that attempts to reconcile these competing interests. Thus, we hold that once it is established that a reinstatement offer is unconditional, a rebuttable presumption arises that the rejection of the offer is unreasonable. To rebut, an employee must offer reasonable grounds for rejection that are grounded in the employment as contemplated by the reinstatement offer and not a purely personal reason.[40]

In so holding, we shift to a claimant the burden of *production,* i.e., reasonable grounds for rejection, without shifting the burden of *proof* on the issue of mitigation. The failure of a claimant to provide a legitimate basis for a rejection forfeits the right to front pay for the reason that a rejection unrelated to conditions of employment under the reinstatement offer would be based on personal choice and would therefore be unprotected by discrimination laws. See pp 129-130. In this way, we honor the policy behind *Ford Motor Co* without violating the law surrounding the affirmative defense of damage mitigation.[41]

---

[38] See pp 123-124.

[39] See Black's Law Dictionary (5th ed), p 55 ("new matter which, *assuming the complaint to be true,* constitutes a defense to it") (emphasis added).

[40] The reinstatement offer in this case required plaintiff to accept a blemish on his work record: the termination was to be reduced to the penalty of disciplinary layoff. Facts on record indicate that previous disciplinary action is considered when new controversies arise and that a prior record justifies harsher penalties for the controversy at hand.

[41] The approach we adopt today is modeled after the burden-shifting

B

In this case, the issue of reasonableness concerning plaintiff's rejection was improperly removed from the jury by way of the grant of partial summary disposition. As defendants point out, an award of front pay and an award of reinstatement are two sides of the same coin.[42] Thus, the choice between these two remedies, if warranted at all under the circumstances of a particular case, can only be made after the other issues have been resolved. Both center on the question whether a rejection of a reinstatement offer was reasonable.

We are persuaded that the trial court was exer-

analysis first created in *McDonnell Douglas Corp v Green,* 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973), a race discrimination case. Recounted briefly, a claimant in an employment discrimination case bears the burden of proving by the preponderance of the evidence that a prima facie case of discrimination exists. If successful, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. Once a valid reason is given, the burden shifts back to the employee to prove that the reason given by the employer is a mere pretext. See also *Clark v Uniroyal Corp,* n 20 *supra.*

In this case we recognize the same shifting of burden, only we reverse it to respect the fact that the initial burden of proof regarding the damages mitigation issue lies with the employer rather than with the employee or applicant. We also point out that the second step is more accurately characterized as the shifting of the burden of production (i.e., producing a valid business reason) than as the shifting of the burden of proof. See n 36. Furthermore, this shifting burden analysis does not preclude the grant of summary disposition on the basis of the absence of any genuine issue of material fact. See *Clark, supra* at 825.

[42] Professor Larson states:

"Front pay" is a monetary award that compensates victims of discrimination for lost employment extending beyond the date of the remedial order. Front pay is considered the equitable equivalent of reinstatement and it is awarded in two situations: first, when reinstatement cannot occur immediately because of the temporary lack of availability of a position or the undesirability of "bumping" another employee; and second, when the remedy of reinstatement is simply not appropriate, usually because of the hostility that has developed between the parties. [Larson, *supra,* § 55.39, p 11-96.121.]

cising its broad equitable powers when it removed the continued backpay and the front pay issues from the jury while preserving the issue of reinstatement as a question for the trier of fact. Regardless of the basis for this decision, however, we hold that the trial court erred as a matter of law by deciding the continued backpay issue *before* the factfinder decided defendants' ultimate liability for the alleged discriminatory discharge, which must take into account the conditions of the offer and the reasonableness of the plaintiff's rejection.[43]

Accordingly, we reverse the Court of Appeals holding in this regard and remand to the trial court for reconsideration of the reasonableness issue and the appropriate remedy.[44]

## IV

Plaintiff also appeals the trial court's ruling that he could not avail himself of the continuing violations doctrine in order to recover for alleged, discriminatory acts occurring before the three-year period of limitation. According to plaintiff, defendants waived the statute of limitations defense for failure to raise it as required by the court rules. Defendants argue that the defense was preserved

---

[43] See *Cardinal Mooney High School v Michigan High School Athletic Ass'n,* 437 Mich 75, 80; 467 NW2d 21 (1991) (questions decided as a matter of law are subject to review de novo).

[44] Defendants also argue that awards of reinstatement may cause unfair burdens on employers and other employees when reinstatement requires demoting an employee who filled the position of the terminated employee. We submit that this policy consideration, though valid, is within the discretion of that court called upon to fashion an appropriate remedy. As mentioned earlier, the primary purposes of title VII and related laws are to eradicate discrimination in the workplace and to make the injured employee whole. In light of this solemn trust, we cannot adopt a general rule precluding reinstatement where it would affect the seniority rights of other employees. Cf. *Franks,* n 14 *supra.*

in its motion for summary disposition. After careful review of the record, we agree with plaintiff that defendants failed to properly raise the defense as it relates to the claim for humiliation damages under the continuing violations doctrine. Thus, it is unnecessary for us to address this claim.

V

Finally, defendants also argue that they were entitled to a directed verdict because the decision to terminate plaintiff was made by someone who based the decision on Senart's report and not on any discriminatory animus. It is true that a claimant asserting an intentional discrimination claim must establish a discriminatory predisposition of the discharging party and an act in furtherance of this predisposition as part of a prima facie case.[45]

In this case, Charles Fern made the decision to terminate plaintiff for destruction of company property entirely on the basis of the report created by Senart. There are no allegations that Fern engaged in any discriminatory behavior. However, plaintiff offered evidence that Fern was made aware of the alleged discriminatory treatment of plaintiff on numerous occasions. Moreover, the record indicates that other employees refused to discuss the incidents of July 12, 1984, with Fern.

We believe that the trial court properly allowed plaintiff to offer proof that Fern's reason for discharge was a mere pretext. This Court has already ruled that ordinarily neutral mechanisms for termination may, in unique circumstances, qualify as

---

[45] See *Schipani v Ford Motor Co,* 102 Mich App 606, 617; 302 NW2d 307 (1981), disavowed on other grounds in *Kostello v Rockwell Int'l Corp,* 189 Mich App 241; 472 NW2d 71 (1991); *McDonald v Union Camp Corp,* 898 F2d 1155, 1160-1161 (CA 6, 1990); *Hawkins v Ceco Corp,* 883 F2d 977, 980 (CA 11, 1989).

discriminatory employment practices. In *Sumner v Goodyear Tire & Rubber Co,* 427 Mich 505, 524-525; 398 NW2d 368 (1986), the plaintiff was discharged for striking a supervisor. Though the decision was made by company officials who were not involved with the alleged harassment, this Court recognized that the harassment may have been orchestrated to cause the plaintiff to commit an offense that would lead to immediate discharge in an attempt to make the termination decision appear to be neutral rather than discriminatory. *Id.* at 539-542. Thus, the discriminatory animus of the plaintiff's supervisors was imputed to the company officials who ultimately made the decision to terminate. We believe that the facts of this case likewise constitute unique circumstances.

Accordingly, we agree with the Court of Appeals that reasonable jurors could have reached different conclusions on the issue whether Fern was aware of the alleged discrimination and whether he acted in furtherance of it, which translates into a predisposition to terminate for discriminatory reasons.

### CONCLUSION

In sum, we affirm the trial court's denial of defendants' motion for a directed verdict on the intentional discrimination claim. However, because the trial court made its decision regarding the appropriate remedy before all factual issues were decided, we remand for resolution of the reasonableness of rejection issue and a reassessment of the appropriate remedy. And, finally, because we find that defendants waived the statute of limitations defense on the continuing violations claim, we do not address plaintiff's claim.

Reversed and remanded to the trial court for proceedings consistent with this opinion.[46]

CAVANAGH, C.J., and BRICKLEY, BOYLE, GRIFFIN, and MALLETT, JJ., concurred with RILEY, J.

LEVIN, J. (*separate opinion*). I concur in the result of the majority opinion, which remands for further proceedings. I write separately because I

[46] Our brother Justice LEVIN makes several points in his separate opinion that deserve consideration. Justice LEVIN indicates that the remedy provision of the Michigan Civil Rights Act does not afford the same wide discretion to fashion a remedy as the federal courts enjoy under the federal Civil Rights Act. We disagree. First, the remedy statute at issue, MCL 37.2801(1); MSA 3.548(801)(1), provides for *injunctive* relief as well as for damages. In addition, MCL 37.2803; MSA 3.548(803) provides for "direct or immediate legal *or equitable* remedies . . . ." (Emphasis added.) However, these terms are not defined in the statutes nor could we find state precedent providing definitions.

The Michigan Civil Rights Act is fairly succinct. Thus, we are convinced that the Legislature intended that our courts look to the more comprehensive federal statutes and precedent for guidance. In fact, state courts have already ruled that federal precedent, although not binding, is persuasive authority. *Robson v General Motors Corp*, 137 Mich App 650, 653; 357 NW2d 919 (1984), rev'd on other grounds in *Sumner, supra; Clark*, n 20 *supra*. The federal remedy statute, 42 USC 2000e-5(g) gives *courts* the power to enjoin discriminatory practice, order reinstatement or hiring of employees with or without backpay, or "any other equitable relief as the court deems appropriate." Not only are we convinced that the spirit behind the Michigan act emulates that behind the federal Civil Rights Act, but we could find no direct support indicating a difference between the remedy provisions of the Michigan statutes and the federal ones.

Second, we recognize from cases such as *Albemarle* that a court's discretion is " 'hardly . . . unfettered by meaningful standards or shielded from thorough appellate review.' " See p 123. The viewpoint of the separate opinion seeks to remove guidelines found in federal precedent without offering any meaningful standards to fill the void. We also note the fact that the separate opinion relies exclusively on federal precedent to make this point. The approach we take today is intended to ensure that victims of discrimination are made whole, and a fair degree of discretion is necessary to implement this goal.

Third, we advocate a clear procedure for resolving matters of this nature rather than countenance a convoluted jury question that includes issues of law, as well as issues of fact, in the melange. It is our design to remove the type of uncertainty caused by the lack of clear procedural guidelines that is evident from the specific facts of this case.

do not join in the trifurcated procedure or in a
number of other statements in the majority opin-
ion.

I

The majority asserts that Michigan courts have
broad discretion to fashion appropriate remedies
in wrongful discharge cases.[1] The majority cites in
support the following provision of the Civil Rights
Act:

> A person alleging a violation of this act may
> bring a civil action for appropriate injunctive re-
> lief or damages, or both. [MCL 37.2801(1); MSA
> 3.548(801)(1).]

The cited provision—stating that a person alleging
a violation of the Civil Rights Act has a choice
whether to seek injunctive relief *or* to seek dam-
ages—supports, rather, the view that the court has
no discretion. It would appear that where a plain-
tiff brings an action seeking damages, it is for the
trier of fact to decide whether there has been a
violation of the Civil Rights Act and the damages
to be awarded therefor.

In the instant case, the plaintiff does not seek
damages for "front pay." He sought and continues
to seek reinstatement. There is, therefore, no need
to decide whether the Civil Rights Act should be
read as granting a court, in a case in which the
plaintiff brings an action seeking damages, the
discretion, on a finding that the Civil Rights Act
has been violated, to order reinstatement in lieu of
an award of front pay.

The implication in the majority opinion that
federal cases support the proposition that a Michi-

[1] *Ante,* pp 124-125.

gan court has broad discretion to fashion a remedy
under the Civil Rights Act ignores the significant
differences between title VII and the Civil Rights
Act. The federal cases on which the majority relies
construe an act of Congress (title VII) providing
that on a finding that the respondent intentionally
engaged in an unlawful employment practice "the
court *may* enjoin the respondent from engaging in
such unlawful employment practice, and order
such affirmative action as *may be appropriate,*
which *may* include, but *is not limited to,* reinstate-
ment or hiring of employees, *with or without* back
pay . . . , *or any other equitable relief as the court
deems appropriate.*"[2] No such discretionary lan-
guage appears in the Civil Rights Act. Thus, while
it may be appropriate to look to federal title VII
cases construing some aspects of the Civil Rights
Act, they are not persuasive where a damage
remedy has been sought under the Civil Rights
Act.

II

Nor is there anything in the federal title VII
cases that grants federal courts the power to deny
a plaintiff who has been found to be the victim of
an unlawful employment practice a remedy that
would make him whole.

The majority correctly observes that federal
court decisions speak of broad discretion, under
the federal legislation, concerning the fashioning
of the remedy, but the majority does not state the
full picture. While the federal courts have discre-
tion in determining *how* to make a plaintiff whole,
at least where a plaintiff has not unreasonably
rejected an unconditional offer of reinstatement,
they do not appear to have discretion to determine

_____

[2] 42 USC 2000e-5(g) (emphasis added).

*whether* to make a plaintiff whole. Further, the
discretion concerning how to fashion the remedy
does not appear as broad as the majority implies.

In *Albemarle Paper Co v Moody*,[3] the United
States Supreme Court held that backpay generally
should be awarded to a successful claimant be-
cause this is necessary to make him whole.[4] United
States district courts and circuit courts of appeal
have applied the *Albemarle* presumption—that a
court should award the relief necessary to make
the plaintiff whole—in cases in which plaintiffs
have sought relief other than backpay. These cases
indicate that a federal court must choose a remedy
that makes the plaintiff whole; those remedies
that often most effectively make a plaintiff whole,
such as reinstatement, seem to be favored.

A number of federal courts have applied the
*Albemarle* presumption to reinstatement. In
*Henry v Lennox Industries, Inc,* 768 F2d 746, 752-
753 (CA 6, 1985), the United States Court of Ap-
peals for the Sixth Circuit said:

> While the statute, 42 USC 2000e-5(g), clearly
> provides for reinstatement, the scope of the rem-
> edy rests within the discretion of the district
> court. . . . A finding of intentional discrimination
> presumptively entitles the plaintiff to reinstate-
> ment. . . . "[R]einstatement, like backpay, should
> be denied 'only for reasons which, if applied gener-
> ally, would not frustrate the central statutory
> purpose of eradicating discrimination . . . .' "
> *Grubb* [*v Foote Memorial Hosp,* 533 F Supp 671,
> 676 (ED Mich, 1981)] (quoting *Albemarle Paper Co
> v Moody,* 422 US 405, 421; 95 S Ct 2362, 2373; 45 L
> Ed 2d 280 [1975]).

Similarly, in *Taylor v Teletype Corp,* 648 F2d

[3] 422 US 405, 419-420; 95 S Ct 2362; 45 L Ed 2d 280 (1975).

[4] *Ante,* p 121, n 14.

1129, 1138 (CA 8, 1981), cert den 454 US 969 (1981), cited by the majority, the United States Court of Appeals for the Eighth Circuit said:

> In a Title VII action, however, a court may deny reinstatement "only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." [*Albemarle Paper Co v Moody,* 422 US 405, 421; 95 S Ct 2362, 2373; 45 L Ed 2d 280 (1975).]

Professor Larson said:

> Once it has been established that this kind of adverse employment action [discharge, demotion, or transfer] has occurred because of unlawful discrimination, the courts will normally award reinstatement unless special circumstances exist that make it inappropriate. This presumption is derived indirectly from *Albemarle Paper Co v Moody,* in which the Supreme Court established a similar presumption in favor of the award of back pay. There seems no reason to treat reinstatement differently, especially since *Albemarle's* holding is grounded in the "make whole" purposes of Title VII. [2 Larson, Employment Discrimination, § 55.21, p 11-63.]

From *Henry, Taylor,* and Larson, it seems fair to conclude that a federal court does not have especially broad discretion to determine whether to order reinstatement. If reinstatement is necessary to make a plaintiff whole, it should generally be awarded. To be sure, there might be special circumstances in which reinstatement might be in-

appropriate,[5] and a federal court has discretion to determine whether these special circumstances exist, and, on finding special circumstances, to refuse to order reinstatement. As a general matter, though, a federal court does not appear to have broad discretion to refuse to reinstate a victim of unlawful employment discrimination.

Even when a federal court determines that reinstatement would not be appropriate, it appears that the court's discretion in fashioning a remedy may not be as broad as the majority implies. When "the court has determined that reinstatement is deserved but *cannot be ordered* . . . [it will] most commonly award 'front pay'—that is, compensation for loss of future earnings—in lieu of reinstatement"[6] if such an award is necessary to fully compensate a victim of discrimination and can reasonably be calculated. In the words of the United States Court of Appeals for the Tenth Circuit:

> Although the cases discuss the award of front and back pay as being in the trial court's discretion, the United States Supreme Court has made it clear that this discretion must be exercised so to make possible the fashioning of the most complete relief possible. See *Albemarle Paper Co v Moody,* 422 US 405, 421; 95 S Ct 2362, 2373; 45 L Ed 2d 280 (1975). [*EEOC v Safeway Stores, Inc,* 634 F2d 1273, 1282 (CA 10, 1980) (remanding and ordering an award of front pay).]

---

[5] One "common reason for denying reinstatement is that such an order would require 'bumping' another employee from the position offered for reinstatement. Whether a court will order that an innocent incumbent be bumped depends on a balancing of the equities of the situation. A court may be more likely to order reinstatement, even though it entails bumping, when the position is unique in terms of responsibilities, prestige, working conditions, and salary." 2 Larson, Employment Discrimination, § 55.22, pp 11-69 to 11-70.

[6] 2 Larson, *supra,* § 55.22, p 11-70 (emphasis added).

In short, where reinstatement is not possible and front pay is necessary to make whole a victim of discrimination, it appears that front pay is presumptively available to that victim.[7]

Indeed, the *Albemarle* presumption—that a plaintiff is entitled to the relief that is necessary to make him whole—may control a court's decision whether to award front pay in lieu of reinstatement. A treatise states:

> The widespread use of the terms "backpay" and "front pay" suggests that these two awards are distinct, perhaps even that § 706(g) [42 USC 2000e-5(g)] authorizes the former by the term "backpay" and authorizes the latter by the phrase "other equitable relief." The result is that some appellate courts view the *Albemarle* presumption in favor of a backpay award as inapplicable to a front pay award. It seems more likely, however, that both backpay and front pay are authorized by the "backpay" provision in § 706(g). After all, if the purposes of "backpay" are to compensate an employee for his wage losses and to provide incentive for employer compliance, Congress probably intended the award to include wage losses sustained after the date of judgment. If front pay is an aspect of backpay, the *Albemarle* presumption should have equal applicability to the front pay award. But, even if the two awards have different statutory origins, their close similarity and common purposes require the same approach to their availability. [2 Sullivan, Zimmer & Richards, Em-

---

[7] The United States Court of Appeals for the Eleventh Circuit said, "[i]n addition to back pay, prevailing Title VII plaintiffs are presumptively entitled to either reinstatement or front pay." *Weaver v Casa Gallardo, Inc,* 922 F2d 1515, 1528 (CA 11, 1991). In a recent age discrimination case brought under the Age Discrimination in Employment Act, the United States Court of Appeals for the Fifth Circuit said that while reinstatement is preferred over front pay, "[g]enerally, if reinstatement is not feasible, front pay will be awarded." *Brunnemann v Terra Int'l, Inc,* 975 F2d 175, 180 (CA 5, 1992).

ployment Discrimination (2d ed), § 14.4.3, pp 24-
25.][8]

A federal court thus must choose a remedy that
makes whole a victim of discrimination.

### III

The majority provides for a trifurcated proce-
dure on remand, allocating to the court the deter-
mination whether the offer of reinstatement in the
instant case was unconditional, allocating to the
trier of fact the "resolution of the reasonableness
of rejection issue," and allocating to the court "a
reassessment of the appropriate remedy."[9]

The majority needlessly requires separate deter-
minations of the conditionality of the reinstate-
ment offer and of the reasonableness of the rejec-
tion. In my opinion, there is only a single determi-
nation to be made—did the plaintiff fail to miti-
gate his damages—respecting whether a prevailing
plaintiff may recover damages for a period follow-
ing rejection of an offer of reinstatement. This
issue should be decided by the trier of fact just as
it is in other wrongful discharge cases in this
state,[10] and just as it is in the federal system

---

[8] To be sure, as with reinstatement, there will be instances in which
front pay will not be an appropriate remedy. Professor Larson states
that front pay has been denied where "the plaintiff misrepresented
facts on his employment application," where "the business [that
previously employed the plaintiff] ceased operations," where "the
defendant had already begun to fix the offending employment condi-
tions," and where "the plaintiff had found comparable substitute
employment." 2 Larson, *supra,* § 55.39, p 11-96.125.

These examples, though, do not change the general presumption,
adverted to in the Sullivan, Zimmer, and Richards Employment
Discrimination treatise that front pay should generally be awarded
when it is necessary to make whole a victim of discrimination.

[9] *Ante,* p 113.

[10] See *Riethmiller v Blue Cross & Blue Shield of Michigan,* 151
Mich App 188, 194; 390 NW2d 227 (1986); *Brewster v Martin Mar-*

where the alleged failure to mitigate concerns the plaintiff's rejection of an offer of employment (by his original employer) that differs from his original job or where the plaintiff reasonably refuses to accept an offer of employment from another company.[11] The issue of the conditionality of a reinstatement offer does not become a matter of law to be decided by the court simply because the employer has offered to reinstate the discharged employee.[12]

Assuming arguendo that whether an offer of reinstatement was conditional and whether the plaintiff acted reasonably in rejecting such an offer are proper are separate inquiries, each of these inquiries presents a *question of fact* for the *trier of fact*,[13] and neither may be resolved by the court as a matter of law unless reasonable minds could not

*ietta Aluminum Sales,* 145 Mich App 641, 663; 378 NW2d 558 (1985); *Higgins v Kenneth R Lawrence, DPM, PC,* 107 Mich App 178, 181; 309 NW2d 194 (1981).

[11] As the United States Court of Appeals for the Fifth Circuit has explained:

We think that the cases decided both before and after *Ford Motor Co [v EEOC,* 458 US 219; 102 S Ct 3057; 73 L Ed 2d 721 (1982)] establish that the central question with respect to damage mitigation is for the trier of fact: what amount could the employee have earned through the exercise of reasonable diligence? . . . If the employee has refused the offer of a specific job, whether from defendant or another employer, the question is basically the same: was the employee's refusal of the job reasonable? [*EEOC v Exxon Shipping Co,* 745 F2d 967, 978 (CA 5, 1984).]

[12] Asking only the question whether the plaintiff failed to mitigate his damages will provide the proper incentives for both the discharged employee and the employer. The employee will have an incentive not to reject a reasonable offer to return to work because if the trier of fact were to determine that the employee rejected such an offer, the employee's damages would be significantly limited. Similarly, an employer will have an incentive to make a bona fide and unconditional offer of reinstatement to limit the damages.

[13] In *Pierce v F R Tripler & Co,* 955 F2d 820, 830 (CA 2, 1992), the United States Court of Appeals for the Second Circuit explained:

draw different conclusions concerning conditional-
ity or reasonableness. It will be a rare case in
which reasonable minds could not differ concern-
ing the conditionality of an offer or the reasonable-
ness of a rejection.[14]

### IV

The majority states that it disagrees with the
"indication" in this opinion that the remedy provi-
sion of the Civil Rights Act "does not afford the
same wide discretion to fashion a remedy as the

"Generally, it is the duty of the trier of fact to weigh the
evidence to determine whether a reasonable person would
refuse the offer of reinstatement." *Fiedler v Indianhead Truck
Line, Inc,* 670 F2d 806, 808 (CA 8, 1982). *Whether an offer was
unconditional for purposes of mitigation is similarly a question
for the trier of fact. Cf. Bruno v W B Saunders Co,* 882 F2d 760,
770 (CA 3, 1989) . . . . [Emphasis added.]

The Second Circuit recently reaffirmed this passage from *Pierce* in
*Clarke v Frank,* 960 F2d 1146, 1151 (CA 2, 1992), where it wrote,
"[w]hether the employer made an unconditional offer of reinstate-
ment, and whether the employee rejected that offer, are *questions of
fact* to be determined by the district court." (Emphasis added.)

*Holmes v Marriott Corp,* 831 F Supp 691, 711 (SD Iowa, 1993),
similarly indicates that whether an offer of reinstatement was condi-
tional is normally a question for the trier of fact. In that case, the
court granted the defendant's motion for summary judgment (limiting
its liability for backpay) on the basis that the plaintiff had rejected an
unconditional offer of reinstatement. The court only granted the
motion because "there is simply nothing about the offer of reinstate-
ment that a trier of fact could find would be anything but uncondi-
tional." The clear implication is that conditionality is normally a
question for the trier of fact.

[14] In the instant case, on first blush it may appear that Chrysler's
offer of reinstatement was unconditional because Chrysler offered
Rasheed his old job with his seniority intact. The offer, however,
would have required Rasheed to accept a disciplinary incident on his
record, and this blemish could have subjected Rasheed to serious
punishment if he committed another disciplinary infraction. A trier of
fact could therefore conclude that Chrysler's offer was conditional.
See *ante,* p 132, n 40.

The facts of this case also illustrate that it will rarely be possible to
determine whether an offer is conditional solely on the basis of the
wording of the offer.

federal courts enjoy under the federal Civil Rights Act."[15]

A

The majority states three reasons. The "first" reason is that § 801 of the Civil Rights Act[16] "provides for *injunctive* relief as well as for damages," and § 803[17] "provides for 'direct or immediate legal *or equitable* remedies,'" (emphasis added in the majority opinion), and "these terms are not defined in statutes nor could we find state precedent providing definitions."

The majority continues that the Civil Rights Act "is fairly succinct," and "we are convinced that the Legislature intended that our courts look to the more comprehensive federal statutes and precedent for guidance." The majority adds that it is also convinced that the "spirit" behind the Civil Rights Act "emulates that behind the federal" act, and that it "could find no direct support indicating a difference between the remedy provisions of the Michigan statutes and the federal ones."

Section 803 does not support the majority's construction. Section 803, quoted in its entirety, provides: "This act shall not be construed to diminish the *right of a person* to direct or immediate *legal or equitable* remedies in the courts of the state." (Emphasis added.) This provision simply repeats the language of the constitution providing for the establishment of a Civil Rights Commission, with powers "provided by law to carry out its purposes." The next sentence reads: "Nothing contained in this section shall be construed to diminish the *right of any party* to direct and immediate

[15] *Ante,* p 137, n 46.

[16] MCL 37.2801(1); MSA 3.548(801)(1).

[17] MCL 37.2803; MSA 3.548(803).

*legal or equitable* remedies in the courts of this state."[18]

Manifestly, § 803 simply repeats the concepts set forth in the constitution, and provides, in effect, only that neither the creation of a Civil Rights Commission, nor the provisions of the Civil Rights Act, shall diminish the right of a person to direct or immediate legal or equitable remedies in the courts of this state. That says nothing about what those legal or equitable remedies might be.

The majority is quite right that § 801 provides for "injunctive relief as well as for damages." The majority reads this as empowering the courts of this state to substitute an equitable remedy for a damage remedy. Section 801 does not provide that the courts of this state may provide an equitable remedy, such as injunctive relief, or a damage remedy, as the court thinks best in the exercise of its discretion. It rather provides that "[a] person alleging a violation of this act *may bring* a civil action for appropriate injunctive relief *or damages,* or both." (Emphasis added.)

The discretion whether to seek an equitable remedy, such as injunctive relief "as well as" damages, is, confided by the constitution and the Legislature to the person alleging a violation of the Civil Rights Act. That is consistent with the constitutional provision stating that nothing contained in the constitutional provision establishing a Civil Rights Commission or in legislation enacted to carry out the purposes of that constitutional provision shall be construed to diminish the right of a person[19] to direct and immediate legal or equitable remedies in the courts of this state.

To state the obvious, damages are a legal rem-

---

[18] Const 1963, art 5, § 29 (emphasis added).

[19] The constitution uses the word "party." Section 803 uses the word "person."

edy, an injunction is an equitable remedy. The
choice whether to seek a legal (damage) or equita-
ble (injunctive) remedy is, once again, confided by
the constitution, as well as by the Legislature
(§ 803), to the person alleging a civil rights viola-
tion.

The majority has an extravagant view of judicial
power in concluding that it may arrogate to the
trial courts of this state the power—so clearly
confided by the constitution and the Legislature to
the victim of a civil rights violation—whether to
seek an equitable remedy as an alternative to a
legal remedy.

B

The majority states "second" that this opinion is
deficient in removing guidelines found in federal
precedent without offering any meaningful stan-
dards to fill the void. As set forth earlier in this
opinion, there is no need to address this issue at
all because Rasheed seeks an equitable remedy
rather than a damage remedy, and therefore there
is no need to address the question whether, had he
sought a damage remedy, the courts of this state
could impose an equitable remedy as an alterna-
tive, and what the standards might be in such a
case.

I do not rely on the federal precedent. I discuss
it because the majority relies on the federal prece-
dents that are not in point because the federal
cases construe an entirely different remedial provi-
sion[20] that, as construed by the United States
Supreme Court, confides to trial courts the deci-
sion whether to provide an equitable or other
remedy.

The majority states that "a fair degree of discre-

---

[20] Note 2 and accompanying text.

tion is necessary to implement" the goal of ensur-
ing that victims of discrimination are made whole.
I might agree that where a victim of discrimina-
tion seeks an equitable (injunctive) remedy, a "fair
degree of discretion" on the part of the trial court
might be necessary to implement such a goal. That
does not mean that where the victim of discrimi-
nation seeks a legal (damage) remedy in the exer-
cise of the choice confided to the victim of discrimi-
nation by the constitution and the Civil Rights
Act, this Court is empowered to confide to the
courts of this state a degree of discretion, even a
fair degree of discretion, in the name of making
the victim of discrimination whole, to deny the
victim his choice of a legal (damage) remedy.
Comes the revolution there will be strawberries in
January, you will like strawberries in January,
and you will eat strawberries in January.

C

The majority's "third" point is that the trifur-
cated procedure that it imposes is a "clear proce-
dure for resolving matters of this nature," and
that the alternative is to countenance "a convo-
luted jury question that includes issues of law, as
well as issues of fact, in the melange," and that it
seeks to eliminate "uncertainty caused by the lack
of clear procedural guidelines."

There is nothing convoluted about asking a jury
to decide whether the terms of an offer of re-
instatement were, in the circumstances of the case,
conditional, and, if not, whether the victim of
discrimination was reasonable in rejecting an offer
found by the jury to have been unconditional. The
question is far simpler than questions frequently
posed to juries in patent and antitrust cases and in
ordinary litigation. The jury can be asked to pro-

vide a special verdict "in the form of a written finding on each issue of fact . . . ."[21]

As set forth earlier in this opinion,[22] United States Courts of Appeals, construing the federal statute, have not found it necessary to create a bifurcated or trifurcated procedure. The majority simply prefers to confide to trial courts, and to remove from jury consideration, questions that the majority is more comfortable having a judge decide. This is judicial legislation, an arrogation of power to the courts in an area in which the majority does not trust the jury.

There is ample power under the traditional approach that permits a trial court to remove from jury consideration any issue of fact that, in the judgment of the trial court, all reasonable persons must reach but one result. The majority will have no difficulty reaching the results it believes are manifestly correct under that approach. It does not need a bifurcated or trifurcated procedure to work its will in individual cases.

V

I would direct that on remand the circuit court should enter a partial judgment, in accordance with this Court's affirmance of the finding of discrimination, awarding the plaintiff the $50,000 awarded by the jury plus interest. I would further direct that the defendant be required to reinstate the plaintiff—who sought an equitable remedy[23] and not a legal remedy[24]—as soon as possible.

I would also order the circuit court to set for trial the issue whether the plaintiff failed to miti-

[21] MCR 2.514(A).

[22] Notes 10-12 and accompany text.

[23] An injunction requiring reinstatement.

[24] Except for backpay.

gate his damages by unreasonably refusing the offer of reinstatement tendered by the defendant, and, on a finding that he did not unreasonably reject the offer, require the jury to determine the damages to be awarded until the plaintiff is reinstated, less the amount included therefor in the $50,000 already awarded.